**AFFIRM; and Opinion Filed August 26, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-00421-CV

## IN THE INTEREST OF H.D.V., JR. AND B.V., CHILDREN

**On Appeal from the 303rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 10-04711**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Evans, and Brown
Opinion by Justice Brown

Following a bench trial, Husband appeals a final decree of divorce. In seven issues, he contends the trial court erred in awarding Wife money and property under a premarital agreement, ordering him to pay attorney's fees to Wife's attorneys, awarding child support beyond the statutory child support guidelines, and failing to issue required findings of fact and conclusions of law. We affirm the trial court's judgment.

### BACKGROUND

Several months before their October 2003 marriage, Husband and Wife entered into a premarital agreement and Husband obtained a judgment declaring the agreement to be valid and enforceable. Among other things, the premarital agreement provided that no community property estate would be created. During the marriage, Husband and Wife had two children. In March 2010, Wife filed for divorce. Husband filed a counter petition for divorce.

The trial court entered temporary orders that required Husband to pay Wife's interim attorney's fees. Beginning in October 2010, the court ordered Husband to pay to Wife's attorney an amount equal to the lesser of Wife's actual fees each month or the amount Husband spent for attorney's fees in that same month. In May 2012, the court ordered Husband to immediately pay interim attorney's fees to Pezzulli Barnes, LLP, who had represented Wife, in the amount of $618,373.57. The court later corrected the fee calculation and ordered Husband to pay an additional $57,403.56 in interim fees, for a total of $675,777.13. After they no longer represented Wife, Pezzulli Barnes and another law firm that represented Wife, Nace & Motley, L.L.P., intervened to recover their attorney's fees.

The court held a bench trial in February 2014. Just prior to trial, the parties agreed to a parenting plan, so the trial centered on financial issues. The court signed its final decree of divorce on December 8, 2014. The trial court incorporated the terms of the parenting plan into the decree. It also affirmed the validity of the premarital agreement and found the parties did not have any community property. The court awarded each party all property in his or her possession. It specifically awarded Wife a 2002 Mercedes-Benz as her separate property and divested Husband of all right to that property. Under the terms of the premarital agreement, the court ordered Husband to pay Wife $30,000 as an allowance and also $3 million.

Regarding Wife's attorney's fees, the divorce decree recited that Husband had paid intervenor Pezzulli Barnes $89,537.50 in court-ordered interim attorney's fees and still owed the firm $675,777.13. The decree awarded Pezzulli Barnes a judgment against Husband for $675,777.13. The court also awarded Pezzulli Barnes a judgment against Wife for $675,777.13 and specified that the firm was entitled to one recovery only. The court also awarded Nace & Motley a judgment against Husband for $35,589.09. Only Husband, not Wife, was ordered to

pay those fees.  Wife was solely responsible for the fees she owed two other law firms.  This appeal followed.

**PROPERTY DIVISION**

In his first three issues, Husband contends the trial court erred in awarding Wife money and property under the premarital agreement.  He specifically contends the court erred in awarding Wife (1) $3 million, (2) an allowance of $10,000 a month for the months of January, February, and March of 2010, and (2) the Mercedes-Benz.  We disagree.

### *Award of $3 Million*

We first consider Husband's complaints about the award of $3 million under the premarital agreement.  Section 12.01 is the relevant portion of the agreement.  It provided, "When our marriage is dissolved by death, divorce, or otherwise, each party shall receive" all separate property belonging to that party, one-half of the parties' jointly held property, and all property that would be the party's separate property if they had not married.  Section 12.01 further provided for Husband to make a cash payment to Wife, the amount of which varied depending on the length of the marriage and the value of the parties' separate estates.  In subsections 12.01 (a) through (e), the agreement set out five possible ways to determine that sum.  Because the parties were married more than five years, the relevant provisions were:

> Additionally, in the event of the parties' divorce . . . (b) if the parties have been married for more than five years upon the date of the filing for dissolution of the marriage and if [Wife's] separate property estate has a value of less than TEN MILLION AND NO/100THS ($10,000,000.00) DOLLARS and if [Husband's] separate property liquid net worth has a value of TEN MILLION AND NO/100THS ($10,000,000.00) DOLLARS or more, [Wife] shall receive from [Husband] an aggregate amount equal to the value of 1/2 of the difference between the value of [Husband's] separate property liquid net worth and the value of [Wife's] separate property estate or THREE MILLION AND NO/100THS ($3,000,000.00) DOLLARS, whichever is less; or  . . . (d) if the parties have been married for more than five (5) years upon the date of the filing for dissolution of the marriage and the value of [Wife's] separate property estate is less than TEN MILLION AND NO/100THS ($10,000,000.00) DOLLARS and if [Husband's] separate property liquid net worth has a value of less than TEN MILLION AND

–3–

NO/100THS ($10,000,000.00) DOLLARS, [Wife] shall receive thirty percent (30%) of [Husband's] separate property liquid net worth or THREE MILLION AND NO/100THS ($3,000,000.00) DOLLARS, whichever is less . . . .

In the divorce decree, the court recited that the measurement date for determining the amount owed was the date of the filing of the divorce petition. The court further found that Wife's separate estate was worth less than $10 million and Husband's separate liquid net worth was more than $10 million. The court found that subsection (b) was the applicable subsection and ordered that Husband must pay Wife $3 million.

Husband contends that under section 12.01, the date on which his liquid net worth should have been measured is the date of the divorce, which occurred in 2014. Wife, on the other hand, maintains the trial court correctly determined that the date for determining liquid net worth was the date Wife filed for divorce, March 15, 2010.

Courts interpret premarital agreements like other written contracts. *Williams v. Williams*, 246 S.W.3d 207, 210 (Tex. App.—Houston [14th Dist.] 2007, no pet.). In interpreting a written contract, the primary concern of the court is to ascertain the true intentions of the parties, as expressed in the instrument. *Id.* We examine the entire writing to harmonize and give effect to all the provisions of the contract, so that none will be rendered meaningless. *Id.* All language should be given its plain grammatical meaning unless doing so would defeat the parties' intent. *Id.*

Husband contends the pertinent date is the date of divorce because the opening language of section 12.01 was, "When our marriage is dissolved by death, divorce, or otherwise." He also relies on the phrase, "Additionally, in the event of the parties' divorce or annulment of their marriage," found in the second paragraph, before the different options for calculating the cash payment are presented. He further cites language making the cash payable in a lump sum or in

installments beginning on the first day of the second month immediately "after the date of entry of their *Final Decree of Divorce*."

To support her position, Wife relies on the "upon the date of the filing for dissolution of marriage" language found in each of the five subsections of 12.01. Subsections (a) and (c) provided for a certain payment that if the parties had been married for less than five years "upon the date of filing for dissolution of marriage." Subsections (b) and (d) provided for a certain payment if the parties had been married for more than five years "upon the date of filing for dissolution of the marriage." Subsection (e) provided certain circumstances under which Wife would receive no payment from Husband "regardless of how long the parties have been married upon the date of the filing for dissolution of marriage." For example, subsection (b) provided, "[I]f the parties have been married for more than five years upon the date of the filing for dissolution of marriage" and if Wife's separate property estate had a certain value and Husband's separate property liquid net worth had a certain value, then a certain payment formula is used.

We agree with Wife that the language "upon the date of the filing for dissolution of marriage," which is repeated in the specific subsections providing for calculation of the payment, is determinative. The language Husband relies on — "when our marriage is dissolved by death, divorce, or otherwise" and "in the event of the parties' divorce" — is prefatory language merely indicating that there is no obligation to divide separate property or make any cash payment unless the parties divorce. The language found in the specific provisions for making the calculations controls. Further, to interpret the contract as Husband would have us do, would have provided an incentive for him to decrease his separate property liquid net worth after Wife filed her petition and before the date of divorce to reduce his obligation, which could not have been the parties' intent.

Husband argues that the general rule is for the value of community assets to be determined at the date of the divorce. *See, e.g., Grossnickle v. Grossnickle*, 935 S.W.2d 830, 837 (Tex. App.—Texarkana 1996, writ denied). We are not persuaded that this general rule has any application in this case. The issue here is not the division of community property, but a cash payment under the specific terms of a premarital agreement.

Also under issue one, Husband makes an argument about the interpretation of the term "liquid net worth" used in the agreement. The parties and their experts agree that liquid net worth is "current assets" minus "current liabilities." Husband argues that current assets do not include receivables from entities that do not have the ability to pay. He therefore maintains that his liquid net worth was negative, and Wife was not entitled to any payment under paragraph 12.01 of the agreement. Although Husband phrases this issue as one of contract interpretation, he is actually arguing that there is no evidence to support the trial court's determination that his separate liquid net worth was more than $10 million.

Most appealable issues in a family law case are evaluated under an abuse of discretion standard. *Gonzalez v. Gonzalez*, 331 S.W.3d 864, 866 (Tex. App.—Dallas 2011, no pet.). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or when it acts without reference to any guiding principles. *Id.* The trial court generally does not abuse its discretion as long as some evidence of a substantive and probative character exists to support its decision. *Id.* Because the traditional sufficiency standards of review overlap with the abuse of discretion standard in family law cases, legal sufficiency is not an independent ground of error but is a relevant factor in our assessment of whether the trial court abused its discretion. *Id.* To determine whether the trial court abused its discretion because the evidence is insufficient to support its decision, we consider whether the trial court (1) had sufficient evidence upon which to exercise its discretion, and (2) erred in its exercise of that discretion. *Id.* at 866–67. In

evaluating the legal sufficiency of the evidence, we view the evidence in the light most favorable to the fact finding, credit favorable evidence if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 867. In a bench trial, the trial court is the sole judge of the credibility of the witnesses and may believe one witness over another and resolve any conflicts or inconsistencies in the testimony. *Brauss v. Triple M Holding GmbH*, 411 S.W.3d 614, 620 (Tex. App.—Dallas 2013, pet. denied).

Wife called Steve Scheets, a forensic accountant, to testify regarding Husband's liquid net worth. Scheets testified that the accepted definition of "liquid net worth" was current assets minus current liabilities. In his mind, there was no controversy over the definition. Scheets stated that a "current asset" was an asset that one could withdraw cash from within the upcoming twelve months. Some examples include cash in the bank, stocks, and bonds. Scheets testified that, as of March 15, 2010, Husband had a liquid net worth in excess of $10 million. He estimated that Husband's liquid net worth might be as much as $67.5 million. In reaching his conclusion about liquid net worth, Scheets reviewed various documents, including depositions, tax returns, financial statements, bank statements, and the premarital agreement. In determining Husband's assets, Scheets included interest receivables, salary receivables, and note receivables.

Scheets testified that Husband's financial affairs were complicated. Between the years 1996 and 2010, Husband received taxable salary, interest income, and capital gains of at least $120.9 million. In 2004 alone, Husband received over $4.6 million in capital gains from his personal investments. In 2001, Husband sold a financial services business to Wells Fargo and received $87.5 million for the sale. That same year, his salary exceeded $5.6 million and he had almost $500,000 in tax exempt interest income. At the time of the premarital agreement in June 2003, Husband's personal financial statement showed his net worth was in excess of $71.3 million. According to Scheets's analysis, Husband's net worth increased substantially from June

2003 to March 2010. In 2003, Husband started another company, which we refer to as "TB," that was successful. He invested $49.4 million in the new business. In 2007, TB had gross revenues of almost $100 million. In 2009, TB had earnings before interest of almost $20 million. Scheets testified that number was "in many ways, a measurement of the profitability of the company." Husband had the ability to draw on the TB account for his personal expenses, so it was clear to Scheets that what was the company's money was Husband's money. In November 2011, after the measurement date set out in the premarital agreement, a company offered to buy TB for about $25 million. Scheets also testified about other business entities owned by Husband that had substantial earnings before interest from 2008 to 2010. Scheets testified that during the time period immediately before the measurement date and the year of the measurement date, 2010, the group of five companies Husband owned and controlled was viable enough to pay significant salaries to top management.

Scheets testified that Husband had a number of interest receivable balances with his different entities, the largest being the one belonging to TB. Husband drew $32 million from that account in previous years. Scheets believed Husband could have drawn money from all those accounts. Husband had also drawn funds from salary receivable and note receivable balances. Husband had the ability to draw funds with no oversight. The fact that Husband had the ability to draw funds on those accounts made them a current liability on the company books and a current asset to him. He had the ability to reduce the account with a book entry and make a cash payment to himself. TB was an ongoing business generating profits that Husband still had the ability to draw on in 2010. When asked if he considered TB's ability to pay the interest receivable balance to Husband, Scheets said he looked at TB's payment of that interest in the past. Further, Husband's own balance sheet dated, December 31, 2009, listed various receivables as assets and indicated that his net worth was over $70 million.

Husband argues that Scheets provided only speculative evidence of Husband's liquid net worth. He cites Scheets's opinion that Husband's liquid net worth was between $10 million and $67 million. Husband argues that the award of $3 million to Wife cannot be supported by such speculative evidence. But Scheets indicated he had no doubt that Husband's liquid net worth was at least $10 million. Beyond that, it was immaterial what Husband's liquid net worth was; there just needed to be proof of the threshold number of $10 million.

Further, in a life insurance application dated December 11, 2009, just three months before Wife filed for divorce, Husband indicated that his annual income was $5 million and his net worth was $250 million. By signing the application, Husband declared that the information he provided was "complete and true to the best of [his] knowledge and belief." According to Scheets, Husband's finances did not materially change between December 2009 and March 15, 2010.

Husband called his longtime CPA, William Barnard, to testify. Barnard agreed with Scheets's definition of "current assets." Barnard testified that Husband had notes receivables from various companies for money he invested in them. Barnard did not use these receivables in his calculations because he did not believe they could be turned into cash within a year. At the time of trial, Husband no longer held any notes from TB; they had been converted into equity of TB. He held notes receivable from other affiliate companies, but Barnard testified those companies had no ability to pay back the notes within a year or ever. Barnard testified that, if the measurement date for liquid net worth was the date of divorce, Husband's liquid net worth was a negative number, -$8.2 million. Even if Husband's liquid net worth was measured as of March 15, 2010, it was still a negative number, -$2.1 million. Barnard believed that section 12.01(d) was the applicable subsection of the premarital agreement for determining the amount

of the cash payment to Wife. He concluded that under 12.01(d), Husband did not owe Wife any money.

Husband's financial affairs were complex. The court heard a great deal of evidence. The reporter's record consists of more than forty volumes, many of which contain exhibits relevant to Husband's finances and those of his various business entities. The trial court had the ability to judge the credibility and demeanor of the witnesses. We defer to its resolution of the issue of Husband's liquid net worth. The court did not abuse its discretion in determining that Wife was entitled to $3 million under the premarital agreement. We overrule Husband's first issue.

### *Award of Monthly Allowance*

In his second issue, Husband contends the trial court erred in awarding Wife an allowance of $10,000 per month for three months in 2010. Section 9.04 of the premarital agreement provided that, during the marriage, Husband would deposit $10,000 each month into a separate property account of Wife's to be used for all her personal expenses. This obligation ceased upon separation or upon the filing of a petition for dissolution of the marriage. Wife's allowance also ceased if [Husband's] liquid estate became less than $5 million. In the decree, the court recited that Husband had failed to pay Wife her allowance for the months of January, February, and March of 2010. The court ordered Husband to pay Wife $30,000. Similar to his argument in issue one, Husband maintains his liquid estate was a negative number in 2010, and he thus had no obligation to pay the allowance. We have already determined there was ample evidence before the trial court that Husband's liquid net worth was at least $10 million as of March 15, 2010, thus this argument is without merit.

Husband further asserts that Wife's monthly allowance for the first three months of 2010 should have been reduced. Section 9.04 provided for reduction of the monthly allowance by 50% of Wife's gross monthly wages, if any. Husband maintains Wife earned wages in 2010. He

–10–

relies on her 2010 tax return, which showed her wages were $101,705 in 2010. But there is nothing in the record to show these wages were earned during the first part of 2010. Wife testified that she did not work during the marriage and that Husband's business "decided to give her a paycheck" after she filed for divorce. The Chief Strategy Officer for all of Husband's companies also confirmed that TB did not pay Wife until after she filed for divorce.

Husband also suggests that because in the past he had at times paid Wife more than $10,000 per month, he should not owe her $30,000 for January through March of 2010. He testified that he paid her about $270,000 in 2009. Under the premarital agreement, Wife was entitled to $10,000 a month if certain circumstances were met. The agreement did not provide for any reduction in allowance for prior overpayment. Husband also asserts that Wife should not be able to recover for past unpaid allowances after filing for divorce. We likewise find no support in the premarital agreement for this argument. We cannot conclude the trial court abused its discretion in awarding Wife the $30,000 in allowance. We overrule Husband's second issue.

### *Award of Vehicle*

In his third issue, Husband contends the trial court erred in awarding Wife the Mercedes-Benz. He asserts the car was held by his mother's estate and became the property of the HDV 2008 Trust. Before her death, Husband's mother created the trust for Husband's benefit. The trust appointed Husband as the sole trustee and the primary beneficiary. Husband and Wife's children were named as secondary beneficiaries. The trust agreement contained a provision prohibiting the principal or income of the trust from being "seized, attached, or in any manner taken by judicial proceedings against any beneficiary or distributed on account of the debts, assignments, sale, divorce, or encumbrance of the beneficiary or distribute." Husband maintains that awarding the car to Wife violated the terms of the trust.

Spendthrift trusts are trusts with language prohibiting the voluntary or involuntary alienation of the beneficial interest. *In re Bancorp South Bank*, No. 05-14-00294-CV, 2014 WL 1477746, at *2 (Tex. App.—Dallas Apr. 14, 2014, orig. proceeding) (mem. op.). Such a trust protects the beneficiary from his creditors by expressly forbidding alienation of his interest in the trust. *Id.* The corpus, the accrued income which has not been paid to the beneficiary, and any future income to be paid to a beneficiary of a spendthrift trust are not subject to the claims of the creditors of the beneficiary while those amounts are in the hands of the trustee. *Id.*; *see* TEX. PROP. CODE ANN. § 112.035(a) (West 2014).

Here, the trust agreement gave Husband as trustee the power to "sell, exchange, give options upon, partition, convey, or otherwise dispose of . . . any property that may from time to time be or become part of the Trust estate." Husband testified at trial that the car was in Wife's possession. Thus, there was evidence the car had been conveyed or distributed from the trust and was no longer protected by the spendthrift provision. The trial court did not abuse its discretion in awarding the car, which was in Wife's possession, to her as separate property. We overrule Husband's third issue.

### ATTORNEY'S FEES

In his fourth issue, Husband complains that the court erred in ordering him to pay Wife's attorney's fees to her attorneys. He asserts that no contractual or statutory basis existed to require him to pay Wife's fees. He seeks reversal of that portion of the decree ordering him to pay Wife's unpaid fees and seeks to recover the $89,537.50 paid to Pezzulli Barnes. We conclude sections 6.502 and 105.001 of the family code support the court's award of attorney's fees.

The parties' premarital agreement makes no mention of attorney's fees. Under section 9.01 of the agreement, Husband was responsible for paying their reasonable, ordinary, and

customary living expenses. In the decree, the trial court also found that the premarital agreement did not bar the payment of attorney's fees in a suit affecting the parent-child relationship and did not prohibit payment of attorney's fees.

Husband maintains that *Tedder v. Gardner Aldrich, LLP*, 421 S.W.3d 651 (Tex. 2013), controls the outcome in this case. In that case, the supreme court considered whether legal services provided to one spouse are necessaries for which the other spouse is statutorily liable to the attorney under sections 2.501 and 3.201 of the family code. Section 3.201 provides that a person is personally liable for the acts of his or her spouse if the spouse incurs a debt for necessaries as provided by section 2.501. TEX. FAM. CODE ANN. § 3.201 (West 2006). Section 2.501 provides that each spouse has a duty to support the other spouse and that a spouse who fails to discharge the duty of support is liable to any person who provides necessaries to the other spouse. *Id.* § 2.501 (West 2006). In *Tedder*, the court ruled that necessaries under section 2.501 were things like food, clothing, and habitation, not legal fees in a divorce proceeding. *Tedder*, 421 S.W.3d at 656.

*Tedder* merely addressed whether attorney's fees were a necessary under section 2.501. It does not control the outcome of this case because Wife invoked other sections of the family code to support ordering Husband to pay her interim attorney's fees. Wife has asserted in the trial court and on appeal that the award of interim fees was proper under section 6.502 of the family code. Under section 6.502(a)(4), while a suit for dissolution of a marriage is pending and on the motion of a party or on the court's own motion, the court may render an appropriate order, including the granting of a temporary injunction for the preservation of the property and protection of the parties as deemed necessary and equitable, including an order for payment of reasonable attorney's fees and expenses. TEX. FAM. CODE ANN. § 6.502 (West 2006). This statute gives the trial court the broadest form of discretion when granting orders. *In re C.F.M.*,

–13–

360 S.W.3d 654, 658 (Tex. App.—Dallas 2012, no pet.); *Herschberg v. Herschberg*, 994 S.W.2d 273, 278 (Tex. App.—Corpus Christi 1999, no pet.). The award of interim attorney's fees must be based on the needs of the applicant as weighed against the ability of the opposing party to pay such fees. *Herschberg*, 994 S.W.2d at 279. In community property cases, the danger to be guarded against is that the spouse in control and possession of the bulk of the marital estate will use that control to his or her advantage in the adversary process, leaving the other spouse with inferior representation and at a disadvantage with regard to the division of property. *Id.*

Wife asked the trial court to equalize the parties' attorney's fees. She argued to the court that she had no money to defend herself in the proceedings because Husband was denying her access to her separate property. Seven months in to the litigation, Husband had spent almost $500,000 on his own legal fees. At a hearing on Wife's motion to modify the temporary orders in October 2010, Husband testified that he spent over $200,000 a month on household expenses. He testified that he and Wife owned the same amount of stock in TB. There was evidence showing that money was coming out of the company to pay Husband's law firm. Husband acknowledged that Wife did not have the same opportunity to have TB pay her legal fees. Husband further acknowledged that he asked Wife to sell some of her jewelry, worth a substantial amount of money, because the company needed money. Husband deposited the money into the household account and did not give Wife the money for the jewelry. Wife testified that she did not have any money left and was unable to pay her attorneys. At the conclusion of the hearing, the court ordered Husband to pay Wife's attorney the lesser of her actual fees or the amount he spent on fees. The court stated that its goal was to prevent either party from winning or losing just because they got "out-gunned or out-moneyed."

Husband cites case law for the proposition that where there is no community property, it is error to order one spouse to pay the attorney's fees of the other spouse. *See In re Eaton*, No.

–14–

02-14-00239-CV, 2014 WL 4771608, at *5 (Tex. App.—Fort Worth Sept. 25, 2014, no pet.) (mem. op.); *Chiles v. Chiles*, 779 S.W.2d 127, 129 (Tex. App.—Houston [14th Dist.] 1989, writ denied). These cases are distinguishable because here the evidence showed Husband controlled Wife's separate property. Scheets testified at trial that even though Wife was an equal owner of TB, Husband had the ability to withdraw funds from the company and she did not. Although there was no community property in this case, nothing in section 6.502 limits the trial court to orders concerning community property. The consideration mentioned above, that one spouse might be disadvantaged in the trial process, was relevant here. Because Husband controlled Wife's separate property interest in the company and denied her access to it, we conclude the trial court was within its discretion in ordering Husband to pay interim attorney's fees under section 6.502.

In addition, section 105.001 of the family code also supports the court's award of interim attorney's fees. It provides that in a suit affecting the parent-child relationship, a court may make a temporary order for the safety and welfare of the children, including an order for payment of reasonable attorney's fees. TEX. FAM. CODE ANN. § 105.001 (West 2014). Husband maintains that Wife did not produce any evidence that the attorney's fees were needed for the safety and welfare of the children. *See In re Rogers*, 370 S.W.3d 443, 446 (Tex. App.—Austin 2012, orig. proceeding) (party seeking order for attorney's fees under section 105.001 had burden of showing it is necessary for safety and welfare of children). But there were many issues before the court that related to the safety and welfare of the children. Shortly after Wife filed for divorce, Husband sought a protective order alleging Wife had engaged in family violence to Husband. The court's April 2010 temporary orders gave Husband primary possession of the children and provided for supervised visitation for Wife based on the family violence allegations. Wife claimed Husband manufactured the family violence claims and

–15–

sought to reverse this finding and eliminate the supervision requirements. She also alleged Husband had a history of family violence and asked that the court deny him access to the children. The court later found that both parties had a history of family violence and modified the visitation rules. Further, the court could have properly determined that ordering Husband to pay Wife's fees was for the welfare of the children because otherwise Wife would be taking money away from the children to pay her legal fees. We conclude the court was acting within its discretion in determining the award of attorney's fees to Wife was needed for the children's welfare under section 105.001.

In addition, Husband argues that for divorce suits filed before September 2013, such as this one, the family code does not allow attorney's fees to be awarded directly to the spouse's attorney. For suits for dissolution of marriage filed on or after September 1, 2013, section 6.708 of the family code expressly provides that a court may award reasonable attorney's fees and order them paid directly to the attorney. TEX. FAM. CODE ANN. § 6.708(c) (West Supp. 2015). Husband contends that the existence of the new provision in section 6.708(c) demonstrates that, prior to the effective date, there was no right of recovery against a spouse by the other spouse's divorce attorney. Nothing in the language of sections 6.502 or 105.001 prohibits ordering the payment of fees directly to a spouse's attorney. We conclude that the effective date of section 6.708(c) does not preclude an award of fees in this case directly to Wife's attorney under sections 6.502 or 105.001.

Husband also contends that even if the award of interim fees was authorized by law, the amount awarded is not supported by the evidence. He complains about the fact that the court ordered him to pay Wife's attorneys an amount equal to the lesser of her actual monthly attorney's fees or the amount he was paying his own attorneys, whichever was less. Husband asserts the court abused its discretion because this formula was arbitrary and improper. We

conclude ordering interim fees as the court did served the stated purpose of equalizing the parties and making sure one party was not at a disadvantage.

Further, there was evidentiary support for the amount of fees awarded in the final judgment. At trial, Michael Pezzulli with Pezzulli Barnes testified that the total fees still owed to his firm on the case were $927,965.50. (We note the court did not award Pezzulli Barnes all the fees it claimed.) Mr. Pezzulli testified that the fees were reasonable and necessary. He prepared a lengthy affidavit in support of the fees, summarizing the work done. Kristi Motley, of Nace & Motley, testified that the total amount still owed for her firm's representation of Wife was $35,589.09. She testified that the amount of fees incurred was reasonable and necessary.

Husband contends the firms failed to segregate secretarial work from legal work, citing *Allen v. U.S. Steel Corp.*, 665 F.2d 689, 697 (5th Cir. 1982). But when asked how much of the fees were related to secretarial work, Mr. Pezzulli testified that all the claimed fees were recoverable. Both firms presented detailed billing statements. Husband also suggests the fees should have been segregated between the child welfare issues and the property issues, but fees for both issues were recoverable under the relevant family code provisions. The trial court had before it sufficient evidence to support the fee award. We conclude it did not abuse its discretion in ordering Husband to pay Wife's attorney's fees as set out in the decree. We overrule Husband's fourth issue.

In his fifth issue, Husband contends the trial court erred by declaring the attorney's fees that Husband was ordered to pay to Wife's attorneys to be a domestic support obligation. On August 1, 2012, Husband filed for Chapter 11 bankruptcy. Intervenor Pezzulli Barnes later moved the trial court to declare that Wife's attorney's fees were a domestic support obligation under the bankruptcy code. The trial court granted the request in April 2013.

–17–

The bankruptcy code exempts from discharge a domestic support obligation. 11 U.S.C. § 523(a)(5) (2016). The term "domestic support obligation" is defined to include a debt owed to a former spouse that is in the nature of alimony, maintenance, or support. 11 U.S.C. § 101 (14A) (2016). Husband asserts that the judgment for the fees, because it is payable to the law firm, not Wife, cannot be a debt owed to a former spouse under the bankruptcy code. But the majority of courts addressing this issue have held that an award directly to an attorney in a divorce decree is a domestic support obligation. *See In re Tepera*, No. 11-80477-G3-13, 2012 WL 439257, at *2 (Bankr. S.D. Tex. 2012).

Husband also contends the obligation is not in the nature of alimony, maintenance, and support. He relies on a provision in the premarital agreement whereby each party agreed to waive his or her right to alimony, on the fact that there was no community property under the agreement, and on the fact that the agreement made no provision for attorney's fees. The trial court could have properly concluded the fee award was a debt in the nature of support under the bankruptcy code. As stated, nothing in the premarital agreement prohibited payment of the fees and they were authorized by the family code. We cannot conclude the trial court abused its discretion in declaring the attorney's fees to be a domestic support obligation. We overrule Husband's fifth issue.

### CHILD SUPPORT

In his sixth issue, Husband contends the trial court erred by awarding child support beyond the statutory guidelines. The decree ordered Husband to pay $2,137.50 in child support each month. Husband maintains that under the statutory child support guidelines, he should have instead been ordered to pay $1,218.75 per month. He further contends that because the support varied from the statutory guidelines, the trial court was required to make findings under section 154.130 of the family code.

A trial court has discretion to set child support within the parameters provided by the family code. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011). A court's order of child support will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). When, as here, the trial court does not sign findings of fact, it is implied that the trial court made all the findings necessary to support its judgment. *Id.* Child support is generally determined by calculating the child support obligor's monthly net resources and applying the statutory guidelines to that amount. *In re B.Q.T.*, No. 05-14-00480-CV, 2016 WL 861633, at *1 (Tex. App.—Dallas Mar. 7, 2016, no pet.) (mem. op.); *see* TEX. FAM. CODE ANN. §§ 154.062, 154.125, 154.129 (West 2014 & Supp. 2015). The court may order support in an amount that varies from the guidelines, but is required to make certain findings to support any such variance. *Id.* §§ 154.123, 154.130(a)(3) (West 2014).

In support of his assertion that the child support should have been $1,218.75 per month, Husband asserts that his income at the time of trial was $4,875 per month in Social Security and veteran's benefits. Twenty-five percent of $4,875 is $1,218.75. *See* TEX. FAM. CODE ANN. § 154.125 (when obligor's monthly net resources are not more than $7,500, family code guideline for obligor with two children is child support equal to 25% of monthly net resources). In his brief, Husband relies solely on his evidence and makes no mention of the evidence from which the trial court could have concluded his net resources were much higher. As the factfinder, the trial court was free to disbelieve Husband's evidence and credit Wife's.

Further, we note that in temporary orders, the court ordered Husband to begin paying about $7,000 in child support on August 1, 2012. On August 1, 2012, Husband filed for bankruptcy and caused his business to also file for bankruptcy. After a child support review hearing in December 2012, the associate judge found that Husband's net resources were difficult to ascertain due to the complexity of his business dealings. The court determined his average

monthly net resources exceed $7,500 a month. The court found that, simultaneous with the court's initial child support order, Husband began to allege he was unable to earn income. Despite this claim, Husband was paying his monthly living expenses of between $9,000 and almost $25,000, in addition to childcare when the children are in his possession in an amount ranging from $4,000 to $7,200. The court found that Husband was intentionally unemployed or underemployed and that his income from assets had decreased in the past year due to his actions to avoid paying Wife child support.

In temporary orders in October 2013, just four months before trial, the court found that Husband's monthly net resources were $8,550. The support ordered in the divorce decree, $2,137.50 per month, is 25% of that number. When an obligor's net resources exceed $7,500 per month, the court shall presumptively apply the percentage guideline to the portion of net resources that does not exceed that amount. TEX. FAM. CODE ANN. § 154.126 (West 2014). The court may then order additional amounts of child support without further reference to the percentage recommended by the guidelines. *Id.* Under the facts of this case, the trial court did not abuse its discretion in ordering child support of $2,127.50 per month. Because the child support ordered was not outside the statutory guidelines, the trial court was not required to make findings under section 154.130. We overrule Husband's sixth issue.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In his seventh issue, Husband contends the trial court erred in failing to issue findings of fact and conclusions of law after being timely requested to do so. Generally the failure to make requested findings of fact and conclusions of law is presumed to be harmful error because the absence of findings and conclusions forces the appellant to guess at the reasons the trial court ruled against him and prevents him from properly presenting his case on appeal. *Bush v. Bush*, No. 05-15-00586-CV, 2016 WL 3660118, at *3 (Tex. App.—Dallas July 7, 2016, no pet.). If the

appellate record affirmatively shows that the complaining party suffered no injury, however, a court's failure to make findings and conclusions is not harmful error.  *Id.*  The final divorce decree is just over thirty-three pages.  It contains a great deal of information about how the court arrived at the judgment.  We have not been hindered in our evaluation of Husband's claims by the lack of findings of fact and conclusions of law.  Husband has not demonstrated how the court's failure to enter findings of fact and conclusions of law has harmed him or prevented him from properly presenting the legal issues in this appeal.  We overrule Husband's seventh issue.

We affirm the trial court's judgment.

/Ada Brown/
ADA BROWN
JUSTICE

150421F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF H.D.V., JR. AND
B.V., CHILDREN

No. 05-15-00421-CV

On Appeal from the 303rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 10-04711.
Opinion delivered by Justice Brown, Justices
Lang-Miers and Evans participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellee recover her costs of this appeal from appellant.

Judgment entered this 26th day of August, 2016.